## KENT v. PORTER & Tr.

The firm of Carlile & Porter delivered a quantity of goods to Cargill & Porter upon an agreement that Cargill should pay for one half, which he did, and that Porter should pay for the other half, which he did not. The goods were invoiced to Cargill & Porter. It was *held*, that the property passed, notwithstanding any agreement between Carlisle & Porter that the firm, composed of those two, should retain an interest in the moity which Porter was to pay for.

Upon the dissolution of the firm of Cargill & Porter, the eventual balance in the hands of Cargill was, as to the moiety belonging to Porter, holden by the process of foreign attachment at the suit of a creditor of Porter.

FOREIGN ATTACHMENT. Cargill, one of the trustees, dis-

closed that in September, 1842, he and Lewis C. Porter went into business together, each to furnish a capital of $750, and agreed to purchase Carlisle & Porter's stock of goods; each to settle for one half the amount, and neither to be holden for the other. According to that agreement they did purchase the stock, and Carlisle settled for one half and took a bill in the following form:

1842.   Guy C. Cargill to Carlisle & Porter,     *Dr.*

Sept. 27.  To half the goods, as per invoice book
          of Cargill & Porter of this date,     $755.66

*Cr.*

  By this sum paid us by W. L. Car-
     lisle,            $264.72

  By your note of this date, payable
     in one year from date, and interest
     after three months,     $245.47

  By your note of this date, payable
     in eighteen months from date, and
     interest after three months,    $245.47   $755.66

E. E., Sept. 27, 1842.

                      Carlisle & Porter.

Since the service of the writ, Cargill & Porter dissolved copartnership, and, although the settlement had not been finished at the time of the disclosure, it appeared that there was probably due to Porter the amount of $755.66, with interest after three months from September 27, 1844, together with $247, the balance of Porter's share of the profits, after all appropriations prior to the service of process are made.

It further appeared that Cargill & Porter took possession of the goods and of the store that had been previously occupied by Carlisle & Porter, and conducted their business there, selling the goods and appropriating their proceeds to the payment of the debts which they contracted in the course of their trade, as it is usual for traders to do.

The invoice of the goods that was made at the time of the sale was delivered to Cargill & Porter, who have since kept it, except when it has occasionally been borrowed by Carlisle; and the respondent, Cargill, had not heard, till after the commencement of the suit, that Carlisle or the firm of Carlisle & Porter claimed an interest in the moiety which Porter had undertaken to contribute as a partner in the concern of Cargill & Porter.

He further disclosed, in answer to an interrogatory to the point, that he knew of no individual purchase made by Porter of Carlisle, unless it may be considered as a purchase by him when the three — Carlisle, Porter and Cargill — agreed together that Cargill & Porter should purchase the stock of Carlisle & Porter, and each pay for one half, and neither be holden for the other; and he supposed that the purchase was made under that agreement.

He further disclosed that Carlisle agreed with him that he would take Porter as paymaster for one half of the goods, and that Porter agreed to pay for them accordingly.

After occupying the store in which they began, and which had been previously occupied by Carlisle & Porter, Cargill & Porter removed to another.

Porter disclosed that more than a year prior to the 27th day of September, 1842, he had been a partner with Carlisle, which firm on that day sold one half of their stock of goods to Cargill, and Porter agreed to purchase the other half, and give security therefor, which, however, was never done; that Carlisle & Porter suffered the half of the goods to go into the firm and business of Cargill & Porter, upon an understanding between Carlisle & Porter that the proceeds should go to pay the creditors of their firm.

The whole of the goods were inventoried to Cargill & Porter; one half of them being the contribution of Cargill, and the other constituting Porter's share of the stock in trade of the new firm. The invoice commenced as follows:

"Messrs Cargill & Porter bought of Carlisle & Porter, Sept. 27, 1842, one shawl," &c., &c.

The whole stock was delivered to Cargill & Porter, and was by them sold out to customers.

*Wells*, for the plaintiff.

*Young*, *Benton* and *Cooper*, for the trustees.

GILCHRIST, J. The trustees were partners, one of whom, Porter, is also the principal debtor, and the question that has seemed mainly to engage the parties, and which is for present consideration, is whether the balance in the hands of the firm, for division, belongs to the persons who ostensibly constituted that firm, or whether Porter, as one of the partners, represented the firm of Carlisle & Porter, of which he was also a member.

The stock of goods which composed the capital of the firm of Cargill & Porter, belonged, when that firm was formed, to the older one of Carlisle & Porter, and was delivered by that firm to Cargill & Porter, upon an agreement, about the terms of which there appears not to have been a perfectly consistent apprehension among all the parties, but the most important of which are perhaps sufficiently ascertained for the purposes of the question presented.

Both of the trustees agree that the stock was to constitute the stock in trade of the new firm; that Cargill was to pay one half of it, and did pay; that Porter was to pay for the other half of it, and that the half for which he was to pay should constitute his share of the stock in trade; that the goods were inventoried and delivered to Cargill & Porter, and by them received and sold as their goods.

Cargill supposed that the sale to Porter of the half which he was to contribute, was absolute, and had been perfected

by the agreement, although he never knew how Porter arranged with his partner concerning that partner's share of the price which was allowed for the moiety of the goods.

Porter, on the other hand, says that Carlisle & Porter suffered that moiety of goods to pass into the concern of Cargill & Porter upon an understanding between himself and Carlisle that the proceeds should go to pay the debts of the old firm, and that an arrangement should be made at some time, by which he should give the proper security for the price of the goods, and that no sale had in fact been made to him of the goods, and no such security as was contemplated had ever been furnished.

It is upon the strength of this part of Porter's disclosure that a question is founded, whether he or Carlisle & Porter is the party entitled to the eventual dividend of the effects of Cargill & Porter.

It is a very material circumstance that an invoice was made to Cargill & Porter, and delivery made to and possession taken by them in pursuance of that invoice, so that if any interest remained in Carlisle after the apparent sale, it was contrary to the written act, so far as the invoice could be deemed one, and contrary to the possession, which appears to have been unequivocal and absolute.

Another circumstance is, that it had been agreed by all the parties that Carlisle & Porter should sell one half of the goods to Porter, as they did sell one half to Cargill; that Cargill supposed such a sale to have been made, and that he never heard that Carlisle & Porter claimed any interest in the moiety till after the suit was commenced.

Now if the real state of things was so totally different from what the visible transaction between the three parties and before the world, denoted, there must, it would seem, have existed some motive, not disclosed by the case, for keeping that state of things a secret, not only from the public, but from a party entitled, by his position, to the confidence of one at least of the others.

Kent *v.* Porter.

The security of Carlisle & Porter, which must have constituted the motive for attempting to retain their hold upon property apparently sold, required that plain and indisputable evidence should have been kept of so extraordinary an arrangement; and it would seem equally to have required that Cargill at least should know of it at the time; which it is not pretended that he did.

A fact so long without apparent motive kept secret, and disclosed only at the moment when very earnest desires for its existence, are induced by a change of circumstances, requires distinct and very positive evidence to establish. Such evidence we are not prepared to say exists in this case; and the language of Porter in denying the sale, and asserting an understanding between himself and Carlisle, in conflict with what appears to have been the agreement between those persons and Cargill, and with the fair legal effect of the invoice and delivery of the property, must be taken rather as an expression of his own hopes and purposes, of seeing the avails of the goods eventually applied to the payment of the debts that the old firm owed for them, than as truly representing a state of facts.

The goods were delivered to Cargill & Porter in pursuance of an arrangement, about which there is not the least dispute or question, between the persons who knew all the truth. They are claimed by one of those parties in conjunction with another, in direct hostility to that agreement.

Both of these retracting parties partook in the agreement that they should be sold, and both partook in the manual tradition, and in the invoice which appeared to consummate the sale. That Porter has not done all that the firm of Carlisle & Porter expected him to do in making the security, must be regarded as immaterial, even if any such bargain between the right hand and the left were ever made.

We conclude, therefore, that the party entitled to the

eventual dividend of the clear effects of Cargill & Porter, is Porter himself, the nominal as well as the only real partner, and not Carlisle & Porter, who parted with the goods upon the personal credit of Porter.

Since the service of the process the firm has been dissolved, and the amount to which each partner is entitled, upon a division, ascertained with sufficient exactness to enable the firm to be charged with a certain sum in the hands of Cargill.

*Cargill, trustee, charged.*